# WILLIAM SOBY

## v.

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Gaming Contract—Board of Trade—Bucket Shops—Options—Act of July, 1887—Intention—Indictment.*

1.   Upon an indictment under the act of July, 1887, touching trading in options, it is proper to show the intention of those entering into the contracts claimed to have been within such act.

2.   The guilty intention of the keeper of a place wherein such business is carried on, consists in knowingly allowing such transactions, it being understood that there is to be no receipt or delivery of the property involved.

3. It makes no difference in such cases whether the keeper is directly interested in the deal in question.

4. A count based upon a section of a legislative act referring to accessories, seeking to reach the principal, is bad.

5. In the case presented, the court holds that the verdict of guilty must stand, it being supported by two good counts, although the others are defective.

[Opinion filed January 21, 1889.]

IN ERROR to the Circuit Court of Morgan County; the Hon. CYRUS EPLER, Judge, presiding.

Messrs. EDWARD L. McDONALD and H. S. WHITLOCK, for plaintiff in error.

It is not the intention of the statute under which this indictment is found to prohibit the buying or selling of grain, cattle, hogs or any other commodity for future delivery, even though only a part of the purchase price be paid at the time of purchase, and when the balance is not to be paid until delivery is made, no matter whether the down payment be called margins, security or part payment. Testing the transaction made by Mr. James with Lindblom & Co. through Mr. Soby, their agent, by the law of this State, as repeatedly affirmed by the Appellate and Supreme Courts, this transaction can not, in any sense, be termed a gambling contract, or gambling in grain. That Mr. Soby acted in good faith in receiving the orders from Mr. James, and transmitted them to his principals in Chicago, Lindblom & Co., there can be and is no question; that Lindblom & Co. acted in the utmost good faith is undisputed; the order was received and executed to the letter, and Lindblom & Co. became and were responsible to the persons with whom they contracted for the payment of the grain when the same was to be delivered in the following May, and as a matter of fact, when the contracts matured in May the grain was actually delivered to and paid for by Lindblom & Co., as the testimony of Mr. Lindblom shows in this case. Add to this the further fact that neither Mr. Soby nor Lindblom & Co. knew what was Mr. James' intention at the

time when he gave the orders for the grain; for Soby and James both testify that James never told him what his intention was, and that the only option was as to what day in May the grain was to be delivered. To this state of case apply the law as announced in Pixley et al. v. Boynton, 79 Ill. 351, and particularly Powell v. McCord, 121 Ill. 330. If, then, this case bears the test under the law of a legal and legitimate contract, and we think it does, how then can this be termed "bucket shopping" or the "pretended" buying and selling of grain? On this broad ground the case should be reversed.

What is this crime, designated "keeping a bucket shop" or "bucket shopping?." Is it by any rule of construction possible to broaden the language of the statute or construe its meaning so as to bring the business conducted by the appellant under any of the provisions of this statute?

There is not one word of testimony that shows that Mr. Soby has bought or ever offered to buy a bushel of grain, or has ever sold or offered to sell a bushel, or pretended to buy or sell, either on margins or otherwise, with intention or without intention of paying for and receiving or delivering any such grain or other commodity, but on the contrary we have his undisputed testimony that he has not bought or sold a bushel of anything; nor is there any testimony that Lindblom & Co. have either; the only testimony as to any transaction of L. & Co. is that with Mr. James, and in that case Mr. Lindblom did not sell, or pretend to sell to James, but made his purchases in the open market of Hebbard & Co., and others, for and on account of James. The statute in this case has been misconstrued by the court. The whole act taken together plainly shows that the offense is committed when the person or corporation who is conducting such a place or business, himself pretends to buy or sell grain, etc., on margins or otherwise, with no intention of receiving and paying for the property so bought, or delivering the property so sold. The second section of the act clearly expresses this view in the following language: "The said crime shall be complete against any corporation, association, co-partnership or person

thus pretending or offering to sell, or thus pretending or offering to buy, whether the offer to sell or buy is accepted or not." Who offering to buy? Who offering to sell? The corporation or person thus pretending to so sell or buy, he is one party to the pretended trade—the party of the first part, say, and the person who comes to his shop or offers to trade is the party of the second part; the trade is always in contemplation of the statute with the party of the first part, not between the party of the second part and some third person, but with the bucket shop keeper himself, be he one or many, in one firm or corporation.

Take this view of this statute and we have the "bucket shop," and the trading therein is easily recognized as "bucket shopping;" any other construction of the statute would be doing it violence, and every commission merchant in Illinois, who, although acting in the utmost good faith, would execute an order for his customer in the buying or selling of grain for future delivery, would be absolutely at the mercy of such customer if the law as laid down in this case is to prevail, no matter what his intention might be. All that is necessary, is for the people to ask the customer what his intention was as to receiving and paying for grain so bought, or delivering grain so sold, and if his answer is that he did not intend to receive it, or deliver it, as the case may be, the guilt of the commission merchant is thus established.

Mr. Chas. A. Barnes, for defendant in error.

Justice Scott says, in Pearce v. Foot, 113 Ill. 239: "Although the statutes being considered are highly penal, there is no warrant for construing them with any unreasonable strictness. They ought rather to have a just, if not liberal, construction, to the end the legislative intention may be accomplished—to prohibit all dealings in options in grains or other commodities. Nothing is productive of more mischievous results. Considerable fortunes, secured by a life of honest industry, have been lost in a single venture in 'options.' The evil is all the more dangerous from the fact it seemingly has the sanction of honorable commercial usage in its support-

It is a vice that has in recent years grown to enormous proportions. Legitimate transactions on the Board of Trade. are of the utmost importance in commerce. Such contracts, whether for immediate or future delivery, are valid in law, and receive its sanction and all the support that can be given to them. It is only against unlawful ' gambling contracts' the penalties of the law are denounced, and no subtle finesse of construction ought to be adopted to defeat the end it is to be hoped may be ultimately accomplished."

The court, in Coffman v. Young, 20 Ill. App. 76, say: " Sec. 130 of the Criminal Code declares all contracts by which a person has or gives to himself or another the option to sell or buy at a future time, any grain or other commodity, to be gambling contracts and void, and provides for the punishment of persons making such contracts by fine or imprisonment, or both. The rule is now well settled that, to bring a transaction within the provisions of this statute, it is not essential that the contract should, on its face, purport to give to the party an option to sell or buy, but that if the real intention of the parties at the time of making the contract is to deal only in options to be subsequently adjusted or settled upon the basis of the differences in the market. price, and not by the delivery of the commodity sold, the transaction is a gambling contract within the prohibition of the statute, even though it may upon its face purport to be an absolute contract for the sale or purchase of such commodity for future delivery."

In the case of Lyon & Co. v. Culbertson, Blair & Co., 83 Ill. 33, Mr. Justice Walker says: " The fact that no wheat was offered or demanded shows, we think, that neither party expected the delivery of any wheat, but in case of default in keeping margins good, or even at the time for delivery, they only expected to settle the contract on the basis of difference, without either performing or offering to perform his part of the agreement; and if this was the agreement, it was only gaming on the price of wheat, and if such gambling transactions shall be permitted, it must eventually lead to what are called ' corners,' which engulf hundreds in utter ruin, derange and unsettle prices, and operate injuriously on the fair and

legitimate trader in grain, as well as the producer, and are pernicious and highly demoralizing to the trade. * * * It has never been the policy of the law to encourage or even sanction gaming transactions, or such as are injurious to trade, or are immoral in their tendency; and the old maxim that courts will always suppress new and subtile inventions in derogation of the common law would be applied to such contracts. This seems to be a subtile invention to abrogate well established, fair and just principles of the law of contracts, and not only so, but to the great injury of fair and legitimate trade."

The same opinion says: " The statute has prohibited, under heavy penalties, the sale of wheat on called options to buy or sell grain, because of its pernicious tendency; but it seems to us that these contracts for the sale of grain, where neither party intends to perform them, but simply to cancel them before or at their maturity, and pay differences, are as injurious to trade, and fully as immoral as are the sales of options. Neither belongs to fair and legitimate trade. * * * While the law has studiously fostered fair and legitimate trade, it has not sanctioned pernicious practices that are injurious to its votaries, and are demoralizing in their tendencies."

If, under the guise of a legitimate contract, the real intent of the parties be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, is contrary to public policy and is void. Seeligson v. Lewis, 65 Tex. 215.

A contract to purchase shares of stock without the intention to deliver is a gambling contract, and the true character of the contract may be shown, although it was expressed under the guise of a legitimate enterprise. Stewart v. Schall (Md.), 3 Cent. Rep. 509.

Contracts for the purchase or sale of cotton futures are gambling contracts, and immoral, illegal, and contrary to public policy. Nat. Bank of Augusta v. Cunningham, 75 Ga. 366.

CONGER, J.    Plaintiff in error was indicted for a violation of the act in force July 1, 1887, entitled,   " An act to suppress bucket shops and gambling in stocks, bonds, petroleum, cotton, grain, provisions or other produce."'

The first and second sections of the act are as follows :

" SECTION 1.    That it shall be unlawful for any   *   *   *  person to keep or cause to be kept within this State, any bucket shop, office, store or other place, wherein is conducted, or permitted, the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum, cotton, grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold; or wherein is conducted or permitted the pretended buying or selling of such property on margins; or where the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited.    And any   *   *   *   person, whether acting individually or as an   *   *   *   agent of any   *   *   *  co-partnership, who shall be guilty of violating this section shall, upon conviction thereof, be fined in any sum not less than $200 and not more than $500."   *   *   *

" SECTION 2.   *   *   *   and any   *   *   *   person who shall communicate, receive, exhibit or display in any manner  *   *   *   any statements or quotations of the prices of any such property, with a view to any such transaction as aforesaid, shall be deemed an accessory, and upon conviction thereof, shall be fined and punished the same as the principal, and as provided in section 1 of this act."

The first and second counts of the indictment are based upon the first section of said act, while the sixth count is based upon the second section.    The other counts were quashed.    There was a general verdict of guilty, and plaintiff in error fined two hundred and fifty dollars.

The evidence disclosed that Soby had an office in Jacksonville, where he transacted what he called a general commission business.   His own statement of the character and purposes of his business is as follows:

William Soby:  " Am the defendant; live in Jacksonville ; have resided there twenty years ; have office in Ayers' block ; am in grain commission business, as agent of Robert Lindblom & Co., Chicago; the blackboard I have is to put down the quotations of Chicago, New York, St. Louis and Liverpool markets on wheat, corn, oats, pork, lard, etc. ; get quotations from telegraph company and place them on blackboard for convenience of customers ; quotations come daily from 9:30 A. M. till 1 P. M., and from 2 to 3 P. M.; I take orders from customers for grain, etc., send message to Lindblom, who executes order on the Board of Trade; my customer puts up a margin of two cents a bushel, and I remit to Lindblom, to cover shrinkage on the grain; if price declines, this margin must be kept good ; I have never bought or sold a bushel of wheat since I have been in Jacksonville; I never asked the intention of customers; customers have had grain delivered to them."

Cross-examination :  The margin required is two cents a bushel usually; may be one cent if customer desires to limit his loss; in that case the deal would be closed out if market declined one cent; with a two cent margin, if wheat declined I would collect more margin ; there is no delivery unless the option matures; no grain or warehouse receipts have ever been delivered in Jacksonville; I have never bought or sold a bushel of grain in Jacksonville; I bought and sold for others; I kept an office where we were buying and selling on the Chicago market; bought and sold on margins ; the object of my displaying quotations on blackboard was to show the people what the market was, not as an inducement for them to buy of me; if they wished or desired to, they could.   My object was to do a commission business; we do it for the commission there is in it; I keep them there with a view to selling or buying on margins; my business will average 10,000 bushels a day."

Charles James, one of the witnesses for the people, testified: "Know Soby; have been in his office; I don't know exactly what kind of a business he conducts; I suppose he takes orders for grain; since July I bought 5,000 bushels of

wheat, at seventy cents, I think; did not pay for it; put up two cents a bushel margin on it; order closed in a few days; bought in October for May delivery; did not get the wheat; did not need it; sold it for more than I gave; my intention was to make money out of it by buying and selling it in the fluctuations of the market price; did not get any wheat; did not need it; when I sold, I did not deliver any actual wheat; also bought 5,000 bushels corn; put up two cents margin; bought it to make money on by selling it again; was May option; never saw the corn; paid nothing more for it than the two cent margin; at time I bought this 10,000 bushels of grain, I only put up the two cent margin; no talk with Soby about my putting up more; I gave order to Soby; heard in about ten minutes it was bought, by telegraph to Soby."

Cross-examination: "The corn and wheat were bought for May delivery; nothing was due from me until that time except margins; sold out before May; made some money; Soby was acting as agent of Robert Lindblom & Co.; would have taken corn if I had held until May; could have used it."

Re-examination: "Was to pay nothing but the margin of two cents until May, unless necessary; would have had to put up more margins if first had been absorbed by price going down; if I did not do this, corn would have been closed out, that means sold; did not get grain for actual use, but bought it to make money out of it."

An analysis of the first section will show that there are three different ways in which the same offense is described; first, keeping any place wherein is conducted or permitted the pretended buying or selling of grain, etc., either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering if sold; second, keeping a place wherein is conducted or permitted the pretended buying or selling of such property on margins; and third, where the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold.

The pretended buying or selling on margins is a term in popular use and its meaning well understood, and would

doubtless have been a sufficient description of what was intended to be prohibited, except for the ease with which it could be evaded; hence the Legislature have also given the first and third descriptions, so that while those engaged in the transaction may give it such a name as they choose, if it can be seen the real intent of the parties was merely to speculate upon the rise or fall of prices, and no actual delivery was contemplated, but the parties expected to settle upon the differences in the market, then it would be a gambling contract. And whoever keeps a place wherein is conducted or permitted the making of such contracts, is guilty of violating the first section.   Complaint is made of the ruling of the trial court in permitting the intention of James to be shown, and it is quite earnestly insisted that plaintiff in error should not be bound by the intention of another.   The offense defined in the first section is in keeping a place wherein certain kinds of prohibited contracts are made, and to know whether such contracts are of the kind mentioned in the first section the intentions of those entering into them becomes material and is a proper subject of inquiry.   The mere making of such a contract in the office of one who was ignorant of it, and who had provided no conveniences or inducements to those desiring to make such contracts, would be no offense.

The guilty intention of the keeper of such a place is in knowingly allowing the business of buying and selling as above described to be conducted in his place, with the intention on the part of those so engaged not to receive or deliver, as the case may be.

Under the first section it is immaterial whether the keeper of the place is one of the parties engaged in such pretended purchases or sales, or not.

The first part of the second section goes further, and provides that if the keeper of such a place as described in section one offers to make the contracts prohibited in the first section, the offense shall be complete as against him, whether such offer is accepted or not.

The latter part of the second section makes all who shall communicate, receive, exhibit or display, in any manner, any

such offer to so buy or sell, or any statements or quotations of the prices of any such property with a view to any of the transactions prohibited by the first section, an accessory, and liable to the same punishment as the keeper of the room or place mentioned in section one.

The sixth count of the indictment should have been quashed. It does not attempt to change the offense mentioned in the first part of the second section, but seeks under the latter part of the section to make plaintiff in error an accessory to himself.

The communicating, receiving, exhibiting, or displaying of any offer to buy or sell, or quotations of prices mentioned in the latter part of section two, refers to others than the principal, and who in that way assist the principal in committing the offense prohibited by section one.

But there being two good counts, and a general verdict of guilty, those counts will support the verdict, although there are other counts which are defective. Townshend v. The People, 3 Scam. 326; Halliday v. The People, 4 Gilm. 111.

The fact that plaintiff in error was acting as the agent of another, is of no importance in relieving him from responsibility for a criminal act. 1 Bishop's Crim. Law, Sec. 355.

We think the plaintiff in error was properly convicted, and the judgment of the Circuit Court will be affirmed.

*Judgment affirmed.*